STATE *vs.* MARTIN L. MOWRY.

PROVIDENCE—JULY 8, 1899.

PRESENT : Matteson, C. J., Stiness and Tillinghast, JJ.

(1)  *Separation of Jury in Capital Case as Ground for New Trial.*

During the trial of an indictment for murder, the jury, by permission of the court, were taken out for a ride, in charge of deputy-sheriffs, and, while away from all other persons, were permitted by the officers temporarily to leave the carriage and separate from each other for a little distance. It was also alleged that during the ride they were taken beyond the county limits :—

*Held*, that it appearing that there was no misconduct on the part of the jury and no opportunity for any improper communication with them on the occasion in question, the rights of the defendant were in no way prejudiced or jeopardized.

While the law requires that jurors in capital cases shall be kept together during the entire trial, all that the defendant is entitled to is that there shall be no communication between the jury and any outsider relating to the case in any way whatsoever, and that no influence shall be brought to bear upon the jury, or any member thereof, in any way affecting the defendant or the trial of the case.

*Held*, further, that assuming that after the jury passed the county line the officers in charge had no control over them, yet as it appeared that the jurors did not leave or attempt to leave the officers, and the same authority in fact was exercised over them while without the county as while within it, and no opportunity was given for any improper influence to be

exerted upon any of the jurors by outsiders, the irregularity furnished no ground for a new trial.

*Held,* further, that it was the settled law of this State that the mere temporary separation of the jury in a criminal case, where no injury has ensued to the party objecting, is no ground for setting aside a verdict, unless the separation be attended with suspicion of abuse or some improper influence.

(2) *Arrest of Judgment. Caption of Indictment.*

Under the provisions of Gen. Laws R. I. cap. 250, § 19, and cap. 251, § 9, the Common Pleas Division has no jurisdiction over a motion in arrest of judgment in a criminal proceeding, and its refusal to sustain such motion cannot be alleged as ground for a new trial.

*Semble,* The caption is no part of the indictment proper, and a clerical error therein in the date of finding the indictment is not fatal to the indictment.

(3) *Evidence.*

The evidence of witnesses as to what the defendant told them relative to certain alleged occurrences on the night of the murder is admissible, as the defendant's statement of what occurred at the house and in the vicinity thereof at that time, it being evident that it was the intention of the defendant to have the witnesses to whom he told the story account for the murder by inference. It is also admissible as an admission that the defendant was at the house on the night of the murder, and also as to his being up and dressed at an unusual hour of the night. The prosecution also had the right to prove the defendant's explanation of the affair, in whole or part, for the purpose of showing that it was wholly unreasonable and evidently made up for the occasion.

(4) *Evidence.*

Where the State had introduced evidence that shortly before the murder defendant had inquired for a gun with a bayonet, and was informed that the witness had one, and stated that he would go and ask about it, and, further, that there were holes through the head of deceased, and that the bayonet produced at the trial was found amongst the debris in the cellar of the burned house and exactly fitted the holes, the evidence of a witness that he had a bayonet like the one produced at the trial a few weeks prior to the murder, and that it was missing from its place shortly before the tragedy, is admissible as tending to show that defendant had both the desire and opportunity to procure such a weapon, capable of inflicting just such wounds as were found in the head of deceased.

(5) *Technical Irregularities as Ground for New Trial.*

Under the modern system of administering the criminal laws of the State, purely technical irregularities occurring in the trial of cases ought not to be looked on with favor by courts as being ground for a new trial, as they tend to obstruct rather than promote the ends of justice. Unless it appears that the irregularity complained of has prejudiced the defendant in his trial, or that it was of such a character that he might have been prejudiced thereby, it constitutes no ground for a new trial.

INDICTMENT charging defendant with murder.   Heard on petition for new trial.   New trial denied.

TILLINGHAST, J.   The defendant, who, on the 18th day of January, 1898, was convicted of the murder of Abbie J. Reynolds, now petitions for a new trial on the grounds (1) that the verdict is against the evidence ; (2) that the jury, during the trial of the case, went without the county of Providence ; (3) that the court erred in refusing to grant the defendant's motion in arrest of judgment ; (4) that certain erroneous rulings as to the admission of testimony were made by the court ; and (5) that the court erred in various respects in its charge to the jury.

1.   An examination of the evidence in the case satisfies us that the verdict is well sustained thereby.   Although the evidence is all circumstantial in its character, in so far as it tends to connect the defendant with the *corpus delicti*, yet it points so clearly to him as the perpetrator of the terrible crime that the jury were warranted in finding that there was no reasonable doubt as to his guilt.

2.   Was the defendant in any way prejudiced by the fact that during the trial of the case the jury went without the county of Providence ?

The trial occupied the court and jury for eight days, during all of which time the jury were ordered to be kept together, and when out of court were in charge of officers detailed by the court for that purpose.   The defendant's counsel has produced an affidavit from one of the jurors who tried the case, which sets out that on Sunday next before the finding of the verdict the jury were taken to ride and were conveyed into the town of Warren ; that during said ride they separated several times for short periods of time, some of them being unattended by any officer or other person having them in charge, and that while thus separated they were out of sight of each other.

In contradiction of this affidavit the attorney-general has produced the affidavits of five other jurors who tried said case, together with the affidavits of the officers who had the

jury in charge, who severally state that on the day referred
to the jury were taken to ride by permission of the court;
that they rode together in one team; that during the ride
they may have been taken into the town of Barrington; but
that they were not at any time exposed to any improper influ-
ence or to any opportunity for such influence; that they only
left said carriage once, and then only for a short time when
in the woods at a distance from any house and any person;
that they were not separated from each other by more than a
very short distance, and were not at any time unattended by
the officers having them in charge; that no opportunity was
given to anybody to exercise any improper influence over said
jury, and that none was ever exercised in fact.'

(1)     In view of all the affidavits, we think it is very clear that
the question above propounded must be answered in the nega-
tive.    It was entirely proper for the court to permit the jury
to be taken out for a ride; and if, while thus out and away
from all other persons, the officers in charge permitted them
to temporarily leave the carriage and separate from each
other for a little distance, they only yielded to the prompt-
ings of common humanity and the evident proprieties of the
occasion in so doing.    And as it affirmatively appears that
there was no misconduct on the part of the jury, and no op-
portunity for any improper communication with them on said
occasion, the rights of the defendant were in no way preju-
diced or jeopardized.    See Thompson & Merriam on Juries,
§§ 320–1 and cases in note.    While the law requires that
jurors in capital cases shall be kept together during the entire
trial, be it long or short, it does not require that they shall
be treated like prisoners or deprived of the ordinary civilities
which are common between man and man.    All that the
defendant is entitled to is that there shall be no communica-
tion between the jury and any outsider relating to the case in
any way whatsoever, and that no influence shall be brought
to bear upon the jury, or any member thereof, in any way
affecting the defendant or the trial of the case.    In short, the
defendant is entitled to a trial by a jury who are entirely
free from all outside influences and considerations, and who

are governed solely by the law and the evidence received (5) from and under the immediate direction of the court. In this connection we will say that purely technical irregularities occurring in the trial of cases ought not to be looked upon with favor by courts as being ground for new trial, as they tend to obstruct rather than promote the ends of justice. Under the modern enlightened and humane system of administering the criminal laws of the State, the reason for permitting a defendant to take advantage of such irregularities no longer exists. And unless it appears that the irregularity complained of in a given case has prejudiced the defendant in his trial, or that it was of such a character that he might have been prejudiced thereby, it constitutes no ground for a new trial.

But the defendant's counsel argues that when out of the county of Providence the jurisdiction of the officers in charge of the jury ceased, and hence that the jury were not within their control or keeping during the time they were without the county, as required by law. Admitting, for the sake of the argument, that this is so; that when the jury crossed the imaginary line which divides the counties of Providence and Bristol they were free to go where they pleased, and that the officers had no control over them; how does this fact show that the defendant was in any degree injured or prejudiced thereby? The fact appears that they did not leave or attempt to leave the officers in charge, and that the same authority in fact was exercised over them while without the county as while within it. And the further and much more important fact also appears, namely, that no opportunity was given for any improper influence to be exerted upon any of the jurors by outsiders. In these circumstances we fail to see that the irregularity complained of, while we deprecate the remissness of the officers in causing it, is any ground for granting a new trial.

It has many times been held that the mere separation of the jury, though against the express directions of the court and in violation of their duty, will not of itself be a sufficient cause for setting aside the verdict. Thus in *Smith* v. *Thomp-*

*son,* 1 Cowen, 221, two of the jurors, after they had retired to consider of their verdict under the charge of an officer, eluded him and left the jury room. One went to his home and the other to a tavern. Both took supper and remained all night. They joined their fellows in the morning, and the whole went into the court together and rendered a verdict for the plaintiff. The court refused to set aside the verdict on the ground that there was no reason to believe that it had been affected by the fact of their separation, although their conduct was conceded to have been irregular and improper. "It was then remarked," says Sutherland, J., in commenting on the case in *The People* v. *Ransom,* 7 Wend. 423, "that the ancient strictness in relation to the conduct of jurors had been in modern times essentially relaxed ; and the truth of that observation, as well as the correctness of the decision, are abundantly supported by the authorities collected in the learned note of the reporter to that case. The same decisions, under circumstances essentially similar, were made in *Horton* v. *Horton,* 2 Cow. 589, and *Ex parte Hill,* 3 *id.* 355."

It was also held in *The People* v. *Ransom, supra,* that the doctrine upon this subject is the same in criminal, and even in capital, cases as in civil. See *The People* v. *Douglass,* 4 Cowen, 26 ; *The King* v. *Woolf,* 1 Chitty's R. 401. There is some difference of judicial opinion upon this question, however, but the almost universal rule seems to be that a separation by the jury before bringing in their verdict, even in a capital case, does not *per se* render the verdict void, but it will be set aside or not according to circumstances. Many cases upon the subject are collected in a note to Bish. Crim. Proc. Vol. 1, § 828. But as it is the settled law of this State that the mere temporary separation of the jury in a criminal case, where no injury has ensued to the party objecting, is no ground for setting aside a verdict, unless the separation be attended with suspicion of abuse or some improper influence (*State* v. *O'Brien,* 7 R. I. 336), it is unnecessary to further consider this branch of the case.

(2)     3.  The Common Pleas Division had no jurisdiction over

the defendant's motion in arrest of judgment (Gen. Laws
R. I. cap. 250, § 19, and also cap. 251, § 9), and hence it
goes without saying that its refusal to sustain it cannot be
properly alleged as a ground for new trial.   We will, how-
ever, treat the motion as having been properly made and
certified to this Division, and hence forming a part of defend-
ant's petition.   The ground of the motion, as stated, is that
the indictment alleges the commission of the crime at a date
subsequent to the finding of the indictment, and hence is
repugnant to itself and therefore void.

The caption of the indictment is as follows : " Providence,
Sc.   At the Common Pleas Division of the Supreme Court
of the State of Rhode Island and Providence Plantations,
holden at Providence within and for the county of Provi-
dence, on the third Monday of September in the year of our
Lord one thousand eight hundred and ninety-six."

The indictment then charges, in the several counts thereof,
which are all in due and legal form, that the crime was com-
mitted on the thirteenth day of April, 1897.   The caption is
no part of the indictment proper, but is merely the minis-
terial act of the clerk or prosecuting officer.   It is therefore
amendable by reference to the records of the court in which
it was found.   *State* v. *Gilbert*, 13 Vt. 647 ; *State* v. *Smith*,
2 Harring. 532 ; *State* v. *Conley*, 39 Me. 78 ; *State* v. *Jones*,
9 Hals. 357 ; *State* v. *Norton*, 3 Zabr. 33 ; 1 Ch. Cr. L. 335 ;
*State* v. *O'Brien*, 18 R. I. 110 ; Whar. Cr. Pl. & Pr. § 91.
The caption is merely a formal statement which, though
placed at the head of the indictment, is still of no higher
nature than is an entry on the docket made in court by the
clerk (1 Bish. Crim. Pro. § 151); and to hold that a mere
clerical error therein is fatal to the indictment which follows
it would be both senseless and absurd.   Indeed, it is not even
necessary to amend the caption, as was held in a similar case
in Massachusetts, where the court said it was sufficient if
reference to the other records of the court showed the time
of finding the indictment.   *Com.* v. *Stone*, 3 Gray, 453.
The motion in arrest of judgment must therefore be over-
ruled.

4.  Did the court err in admitting the testimony of the
witness Andrew J. Bolster as to what the defendant told him
relative to certain alleged occurrences on the night of the
murder.   Witness stated that he saw and conversed with the
defendant on the fourteenth of April, 1897, and that all of
defendant's conversation was about the fire and what hap-
pened at the Elisha Mathewson house on the night thereof.
It should here be stated, by way of explanation, that the
murder was committed in said Mathewson house on the
night of the thirteenth of April, 1897, and that the house
was then burned to the ground, but the murdered woman
was taken out of the house by the neighbors before she was
dead, although her body was somewhat burned.   It should
also be stated that the defendant lived in said house at the
time of the murder, and had lived there for a number of
years previously.   To return now to the defendant's state-
ments.   Witness was asked if defendant said anything about
five men breaking into the house that night, and witness
said : '' He told me that five men had broken into his house,
had shot him and robbed him and then burned the building.''
That defendant then went on at considerable length to describe
the men, how they were dressed and armed, that they wore
masks, what they did, and where they compelled him to go
with them into the woods near by, after firing the house.
Defendant's counsel duly excepted to the admission of this
testimony.   Deputy Sheriff Oliver A. Inman was also per-
mitted to testify, over defendant's objection, that defendant
said he was at home the night before—that is, the night of
the murder ; that he had undressed and gone to bed at 9:30 ;
that very soon afterwards he was taken with a pain, and got
up and dressed and took some jamaica ginger ; that as soon
as he became easier he went back to bed, lying down with
his clothes on ; that he fell into a drowse, and when he awoke,
somewhere after eleven o'clock, there were five men in the
bedroom where he lay ; that one of the robbers shot him in
the right ear and then asked him where his money was, and
he told them ; that they thereupon took the money and put
it in an old carpet-bag, and then they compelled him to go

with them to show them the nearest way to Douglas pike, &c. Defendant's counsel argues that the foregoing testimony, if admissible at all, must be so upon the ground that it is either a part of the *res gestœ* or else a declaration against interest. That it is not a part of the *res gestœ* is at once apparent; and nobody claims that it is. The attorney-general does claim, however, that, it being the story of the defendant relating to the transaction in question, it was admissible upon elementary principles as a declaration against interest. (3) Whether the testimony objected to was strictly a declaration against interest or not, we think it was admissible as being the defendant's statement of what took place at the Mathewson house and in the vicinity thereof on the night of the murder. In other words, in so far as it goes it is his version of the affair. And while he does not thereby attempt to directly account for the murder with which he is charged, yet it is evident that his intention was to have the witnesses to whom he told the story do so by inference. The testimony was clearly admissible for another purpose, namely, as an admission that the defendant was at the house on the night of the murder, and also as to his being up and dressed at an unusual hour of the night, as aforesaid. The prosecution also had the right to prove the defendant's explanation of the affair, in whole or in part, for the purpose of showing that it was wholly unreasonable and evidently made up for the occasion. Moreover, if, as argued by defendant's counsel, the testimony, if true—that is, if what defendant told the witnesses was true—disproved the case for the prosecution and entirely exculpated the defendant, then we fail to see how its admission, being in his favor, can be made a ground for new trial.

5. The attorney-general was permitted, against the defendant's objection, to ask the witness Martin V. Smith, a neighbor of defendant, whether a few weeks before the murder he had a bayonet like the one produced at the trial, and whether said bayonet was missing from its place on his premises shortly before the tragedy. The State had introduced evidence that shortly before the murder defendant had in-

quired for a flint-lock gun with a bayonet, and that he was told that said Martin V. Smith had such a gun and bayonet and would like to sell it, and that defendant said he would go and ask him about it.     The State had also introduced evidence that there were two holes through the head of deceased, that the bayonet which was produced was found amongst the debris in the cellar of the burned house, and that it exactly fitted said holes.

(4)     We think, as argued by the attorney-general, that the testimony in question was logically admissible as tending to show that defendant had both the desire and the opportunity to procure such a weapon as the one found in the cellar of the burned house, and which was capable of inflicting just such wounds as were found in the head of deceased.     See Harris on Law of Identification, § 154; *Dean* v. *Commonwealth*, 32 Gratt. 912.

6.     The last ground for a new trial is based upon certain alleged errors in the charge of the court.     The exceptions are not set out with that degree of exactness which good practice requires, but we have nevertheless carefully considered the same, and fail to, find any reversible error in connection therewith.     Some of the isolated passages which defendant's counsel has extracted from the charge might, if taken by themselves, show that the court was inclined to express an opinion unfavorable to the defendant.     But when taken as a whole, we are unable to say that it was clearly prejudicial to his rights.

Petition for new trial denied, and case remitted to the Common Pleas Division for sentence.

*Willard B. Tanner, Attorney-General*, for State.
*Stone & Lovejoy*, for defendant.